[Crim. No. 10828. Second Dist., Div. Four. Jan. 25, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. DAN CLIFTON ROBINSON, Defendant and Appellant.

Kate Whyner, under appointment by the District Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Gerald H. Genard, Deputy Attorney General, for Plaintiff and Respondent.

JEFFERSON, J.—This is an appeal from the judgment entered upon defendant's conviction of murder in the first degree. The jury fixed the penalty at life imprisonment. Defendant previously was tried and convicted for the same offense and given the death penalty. However, the judgment was reversed and the case remanded for a new trial by our Supreme Court in *People* v. *Robinson,* 61 Cal.2d 373 [38 Cal.Rptr. 890, 392 P.2d 970].

On Saturday night, February 3, 1962, there was a dance held at the Fox Hills Country Club which lasted until the early morning hours of Sunday, February 4th. After all of

the patrons had left the club, Lewis Grego, the bartender, gave the night's receipts from the cash register in the main dining room to Cyril Morrisey, the night manager. Morrisey placed the money in his office safe and followed Grego back towards the dining room. As he entered the dining room he heard Grego shout, "There's three of them." He saw that Grego was surrounded by three persons wearing masks over their faces. One of these persons had an object resembling "a rod or a broomstick" in his hand. He then heard "two explosions." He remembered nothing after that until he awoke in a hospital three weeks later.

When the police arrived at the country club at about 1:30 a.m. they found Grego dead. His body was slumped in a booth in the dining room. Morrisey was observed lying wounded on the floor nearby. Grego had been killed by a shotgun blast in the face and neck. Morrisey had shotgun wounds in the back. Numerous particles of shotgun wadding as well as two spent shotgun shells were found near Grego's body. On the club parking lot the police officers found an abandoned black 1950 Ford convertible facing down the driveway of the club toward the exit. It was parked across rather than in between the delineated white parking lines. The car's gears were jammed and it was inoperable. The rear license plate was covered by a rag. A cloth mask was found lying about three car lengths away from the automobile. Another similar mask was found on the club golf course. Two of four identifiable fingerprints lifted from the Ford were identified as defendant's. One of the prints was on the dashboard, about a half inch from the starter, and the other was on the ashtray.

At about 2:30 a.m. on February 4, deputy sheriffs Franzese and Walener were on patrol when they heard an all-unit radio report that a robbery and shooting had occurred at the Fox Hills Country Club. At 3 a.m. they were called and instructed to go to a certain location where they would meet an officer who would give them further instructions concerning this robbery. They met the officer as instructed and were told that a car was found abandoned at the country club which the police thought was involved in the robbery; the car was registered to 1100 West 49th Street (no name was given); they were to find the registered owner. They were also told that it was believed a shotgun was used in the robbery "due to the injuries of the victims." The deputies

proceeded to 1100 West 49th Street and found it to be a four-unit apartment house. They arrived at about 4:15 or 4:30 a.m. They observed that the lights were on in the lower right side apartment. The other three apartments were dark. They walked through the entry hall and approached the door of the lighted apartment. The door was open "a foot or so." They knocked and identified themselves. They could see a man (defendant), who was fully dressed (with a jacket on), sitting on the floor of the room, and another man standing in his shorts nearby. The officers "didn't want to get shot," and therefore, as "a matter of just precaution," they stepped inside the apartment with drawn guns and ordered both men to face the wall and to put their hands on the wall.

One of the officers asked who owned the 1950 Ford convertible, and defendant replied that he did, motioning to his pocket and at the same time explaining that he had the pink slip in his pocket. The officer removed the pink slip and a set of car keys from defendant's pocket. (The car keys were later found to fit the ignition of the 1950 Ford found in the Fox Hills parking lot.) Alfred Campbell, the man in the room with defendant, stated that he had owned the car previously, having sold it to defendant the day before. (Campbell was the registered owner.) Defendant told the officers that the car had been stolen from him the previous day or evening. However, a Los Angeles police unit dispatched to go to the apartment house to make out a stolen car report did not arrive until 4:30 a.m. on February 4th shortly after defendant was arrested.

At the time of his arrest defendant also told the officers that his cousin lived in the apartment upstairs on the left side of the building. Willie Hickman, the person to whom defendant referred, was employed as a night porter at the Fox Hills Country Club. He was on duty the night of the murder. He and another night porter, Arthur Johnson, together with the victims Grego and Morrisey, were the only persons still on duty when the shooting occurred. Defendant had been employed at the club for about four months sometime before the shooting. A search of Hickman's apartment turned up an empty gun case and a piece of cloth similar in material to the masks found at the country club. A shotgun was discovered in the foliage near the entrance to Holy Cross Cemetery which is next door to the country club. The spent

shotgun shells found next to Grego's body were fired from this gun.

Defendant's grandfather, Willie Vann, owned a shotgun. He discovered that it was missing sometime during February 1962. He also owned a gun case designed to carry the shotgun. He testified that neither the gun found at the cemetery nor the gun case found in Hickman's apartment were his. However, he admitted that at the preliminary examination he had testified that they were similar to his missing gun and gun case.

On the night of the shooting at Fox Hills, a 1950 Chevrolet was stolen from its parking place about 5 blocks away from the country club. It was later found parked 6 or 7 blocks away from the apartment where defendant was arrested.

Defendant was seen by a neighbor standing beside a black Ford convertible with two or three other men at approximately 6:30 Saturday evening February 3. The neighbor observed that there was a shotgun inside the car which resembled the shotgun found outside the cemetery.

During the course of the trial, the court, out of the presence of the jury, heard testimony on the issue of the admissibility of a recorded confession made by defendant to the police after his arrest. The court ruled that the confession was inadmissible on the grounds that it was secured through physical duress and coercion, and because defendant had not been advised of his rights to counsel and to remain silent prior to the confession. However, after the prosecution's case was completed and the defense had rested, the court allowed the prosecution to reopen its case to permit the jury to hear a statement made by defendant just prior to the formal confession. The following testimony was heard by the jury:

"By MR. WEBB: [Deputy District Attorney.]

"Q. Sergeant Wrona, directing your attention to February the 5th, 1962, were you at Lennox Station any time during that day? A. I was.

"Q. And was your partner, Sergeant Wrona, with you? A. Sergeant Human.

"Q. I am sorry. Sergeant Human. A. Yes.

"Q. All right. On that evening did you and Sergeant Human have a conversation with the defendant? A. We did.

"Q. Over what period of time? A. From approximately 4:15 p.m. till approximately 9:30 p.m.

"Q. I see. Now, at any time during this conversation with the defendant, was anyone else in the room? A. There was.

"Q. Who? A. At one time Virginia Beynon, our statement reporter, at the time the statement was taken; also a person by the name of Willie Hickman.

"Q. When was this person, Willie Hickman, brought into the room? A. At 7 :25 p.m. on the 5th.

"Q. How do you remember the exact time? A. My notes.

"Q. Now, at the time Hickman was brought in, did you or your partner say anything to Defendant Robinson? A. Yes. Sergeant Human asked Willie Hickman if he had stated anything to us, and at this time Willie Hickman informed Defendant Robinson that he had copped out and had named persons involved and who had been at the Fox Hills Country Club the early morning hours of the 4th of February.

"Q. I see. Now, did—in reply to Hickman's statement, did defendant Robinson say anything at that time? A. After the statement, yes.

"Q. What did he say? A. He asked us if he could take Willie and the others off the hook and admit it, and he did say, 'I did'—

"Q. Just a minute now—

"MR. MATTHEWS: No further than that.

"Q. By MR. WEBB: You said he did say such-and-such? A. Yes.

"Q. Do you remember his language up to the point where you were stopped? A. Those were about the words, 'Can I take Willie and the two others off the hook and take the blame myself?

"MR. WEBB: I have nothing further."

Prior to the introduction of this testimony the trial court instructed the jury that it was admitted for the sole purpose of showing the reaction of defendant to the statement made in his presence and was not to be considered for the truth of the statement.

In allowing in this evidence the court reasoned that it was not an admission or a confession but "just one other bit of circumstantial evidence"; that the prosecution had the right to show defendant's reaction to an accusatory statement because it did not believe that "involuntary psychological reaction" could be coerced.

Defendant argued at the trial, and now contends in this appeal, that the recorded confession and the statement of defendant which immediately preceded it were in effect part

of one transaction; that if the confession was inadmissible because it was involuntary and because defendant was not forewarned of his rights, then the statement was embraced within the same protections.

 We find it unnecessary to decide the issue whether the trial court could properly have concluded that the formal confession resulted from police coercion without also concluding that the statement immediately preceding the confession was the product of the same coercion. It is clear the statement was obtained in violation of the rules laid down in *Escobedo* v. *Illinois,* 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977] and *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], and that, under the circumstances presented, a reversal is required.

Defendant had been taken into custody early on the morning of February 4, 1962. He was interrogated at the police station and booked on a murder charge that morning. On the afternoon of February 5 he was again interrogated beginning at about 4:30 p.m. At 7:45 p.m., after up to this point having consistently maintained his innocence, defendant made the statement above alluded to. That the accusatory stage of the proceedings had been reached at this point cannot be doubted. As stated in *People* v. *Faris,* 63 Cal.2d 541, 544 [47 Cal.Rptr. 370, 407 P.2d 282], "The accusatory stage occurs 'when the officers have arrested the suspect and . . . have undertaken a process of interrogations that lends itself to eliciting incriminating statements. . . .' [Citation.]"

 "Once the accusatory stage is reached, a suspect is entitled to counsel, and any statements elicited in the absence of counsel must be excluded unless the accused has been informed of his rights to counsel and to remain silent or has otherwise waived those rights. [Citation.]" (*People* v. *Faris,* *supra,* 63 Cal.2d 541, 544.) Since there was no evidence that defendant was advised of his rights to counsel and to remain silent or that he knowingly waived these rights, the statement should have been excluded. (*People* v. *Dorado, supra,* 62 Cal.2d 338.)

The statement elicited, namely "Can I take Willie and the two others off the hook and take the blame myself," was most certainly incriminating and, in essence, was tantamount to a confession. While we do not agree with the contention of defendant that the evidence when considered apart from the inadmissible statement was insufficient to support the jury's verdict, it was not, in any sense, overwhelming. The evidence

showed, that just before he was shot, the manager of the Fox Hills Country Club had seen three masked men standing around the victim, Grego; he could not identify any of them. It is apparent that the abandoned Ford automobile found with its gears jammed at the scene of the crime, was to be used by the persons who had obviously plotted to rob the club, as a getaway car. Defendant's fingerprints were in this car, the keys to it were found in his pocket and he admitted ownership of it. A witness testified that he had observed defendant standing beside the car six or seven hours before the murder with two or three other persons, and that a shotgun was inside the car at that time. Defendant's explanation that the car was stolen the previous day or evening appears somewhat less than credible—more like an attempt to create an alibi by telephoning in a report of the car's theft—since the police unit dispatched to handle the stolen car report did not arrive until 4:30 a.m., after the arresting officers had already arrived. Finally, a stolen car, taken from the vicinity of the country club, was found parked a few blocks from the apartment where defendant was arrested. However, with all this evidence, there was no direct evidence placing defendant at the scene of the crime when it occurred, or showing that he was one of the three men observed by the manager before he was shot. Defendant's statement asking to be permitted to take all the blame himself filled this vacuum.

That the prosecution heavily relied on the evidence of defendant's statement to support its case is demonstrated by the deputy district attorney's closing argument to the jury, where he stated: ''[R]emember the testimony of Sergeant Wrona just now, the confrontation of Robinson [defendant] by Willie Hickman wherein Willie Hickman made the statement to Robinson, 'I have copped out to the whole thing. I told them that we were involved, were all together in this,' and then Robinson said to the officers, words to the effect, 'Is there any way I can take the whole rap and turn the other three loose?' ''

Later in his argument the deputy district attorney further commented: ''And Robinson says, 'Can I take the blame and cut the other guys loose?'

''What is he taking the blame for? What is he going to take the blame for? For a Hallowe'en prank in February? Surely no one can believe that there was anything in Robinson's mind at that time but the murder. At this time he is stating to the officers, 'All right, my accomplice confessed, can I take the blame for the murder and cut them loose?'

"Now, why would he make such a statement? Would he make it if he had only been along and someone else had pulled the trigger? Or would he make it because he himself had pulled the trigger on that gun and felt that he alone should take the blame or try to? It doesn't sound reasonable that a man who did not pull the trigger would be willing to take the blame for the other man." And, finally, in concluding his argument, the deputy district attorney said: "We have to put the evidence together and if you take this evidence and put it together, you will eventually find the murderer; as you put this puzzle together the face of the murderer becomes clear, and that face is Robinson's.

"There is no other conclusion that can be drawn from the evidence. The evidence puts him there, makes him one with the three men; and his statement to Sergeant Wrona at the time he was confronted by another person who had confessed, naming him, puts him behind the gun. There is no other explanation for his statement; 'Can I take the blame and cut the other guys loose?'

"Can I take the blame for what? Murder. And who is going to take the blame for murder or even ask to take it unless he himself committed it and realizes his guilt and feels his guilt.

"We have put the picture before you; we have put the puzzle together; and in that puzzle the face of the murderer is exposed—is exposed to your view—and the face of that murderer is Robsinson."

The trial in this case was commenced on November 13, 1964. *Escobedo* v. *Illinois, supra,* was decided on June 22, 1964. The Attorney General argues that defendant is precluded from raising any objection to the introduction of this evidence on the ground that it violated the rules of *Escobedo* and *Dorado,* because the record fails to indicate that defendant made a specific objection to the admission of the evidence on this ground at the trial. (See *People* v. *Palmer,* 236 Cal.App.2d 645, 650 [46 Cal.Rptr. 449].) We do not agree with the Attorney General's assertion that the record fails to show defendant's objection. Prior to the trial court's ruling permitting the prosecution to put on this evidence, the court carried on an extended discussion with counsel (taking up some 65 pages of reporter's transcript) concerning the admissibility of the formal confession, during which it was argued by defense counsel that the confession was inadmissible both because it was coerced and because it was made in

violation of the rules enunciated in *Escobedo* v. *Illinois, supra.* A trial memorandum, setting out these grounds for objection was filed by the defense. The court ruled that the confession was inadmissible on both grounds. Thereafter, when the prosecution asked permission to reopen its case to introduce the evidence of defendant's statement made prior to the confession, defense counsel objected on the ground that the statement and the confession were all part of a single transaction and that if the confession was coerced the statement immediately preceding it was also coerced. Another extended discussion took place during which the deputy district attorney argued that the court should reconsider its previous decision excluding the confession made by defendant. The *Escobedo* v. *Illinois* decision was referred to repeatedly. Finally, the court brought an end to the discussion stating in part: "THE COURT: Let's let the record be straight. The Court has invited from counsel on this issue every possible help and I have not taken umbrage. I don't think the question is that clear, that the Court has the right to reject any suggestion and to reverse itself at any time before the trial is over. The evidence is still available and it could go. Now you've both done a fine job for your respective points of view, and you are doing a good job, and in any trial there are bound to be some rulings that somebody doesn't like." The primary purpose in requiring an objection in the trial court—to apprise the court of asserted error to permit its correction at that time—was clearly accomplished here. No more was required.

After the court made its ruling that the statement could go in subject to limiting instructions the record indicates that defense counsel stated "Fine, we'll agree." The Attorney General argues that defendant thereby stipulated to the admission of the statement and that under the invited error doctrine should not be heard now to complain. The context in which counsel's remark was made does not support this interpretation. Before the court had made the statement which is quoted above, the prosecutor had suggested recessing the trial so that counsel could submit briefs on the admissibility of both the confession and the statement. Counsel for defendant said she would not agree. The court then stated its position, indicating, in effect, that it had heard all the argument it needed to hear. The court added that if counsel could not agree (i.e. to a postponement), he would let the ruling stand. The statement of defense counsel "Fine, we'll agree" expressed only her willingness to go ahead without halting

the trial for further briefs. It is clear that defense counsel's statement was not a capitulation of her former objection.

Two additional issues are raised which warrant brief discussion:

▉ Defendant contends that the evidence of his admission that he owned the abandoned Ford convertible found at the scene of the crime should also have been excluded for failure to give the required warning of constitutional rights as prescribed in the *Escobedo-Dorado* decisions. It is clear, however, that at this point in the proceedings the investigation had not yet reached the accusatory stage, nor had the police carried out a process of interrogation lending itself to eliciting incriminating statements. No warning was therefore required.

▉ Defendant maintains that the trial court erred in overruling his objection to the introduction in evidence of the pink slip, the keys and his statement of ownership of the car, on the ground they were obtained as the result of (or were the fruit of) an unlawful search and seizure.

The arresting officers testified they went to the apartment house where defendant's arrest took place after being advised, through official channels, that a robbery and shooting had just occurred at the country club; that a shotgun was used and there were "victims"; that a car found abandoned at the club was believed to have been used in the robbery; and that this car was registered to the apartment house address. With this information the officers were clearly entitled to seek out the registered owner for questioning at the address given. When, upon their arrival, they observed that one of the four units comprising this address was lighted, it was reasonable for them to go to this apartment. As they did so they saw the front door was partly open and that there were two men inside, one sitting fully dressed on the floor. They knocked and identified themselves. They were fully aware that the suspects they sought were highly dangerous and were armed with a shotgun. For all they knew there may have been others in the room, perhaps lurking, armed with the shotgun, outside their range of vision. Under these circumstances the officers were plainly justified in taking reasonable precautions for their own safety. The entry by them into the room with guns drawn, and subsequent ordering of defendant and Campbell up against a wall for a pat down for weapons, were reasonable precautions in aid of a permissible investigation.

When, during the pat down which followed the officers' entry, defendant admitted ownership of the Ford convertible, the officers had reasonable cause to arrest and search him.

With regard to the error in the introduction of defendant's statement to the police, we have examined the record and the evidence presented—some of which is detailed above, and we cannot say that a different result was not reasonably probable had this evidence been excluded. (*People* v. *Watson*, 46 Cal.2d 818, 836 [299 P.2d 243] ; Cal. Const., art. VI, § 4½.) Consequently, the judgment of conviction must be reversed.

The judgment is reversed.

Files, P. J., and Kingsley, J., concurred.