Filed 10/31/22 P. v. Northrup CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C092845 |
| Plaintiff and Respondent, | (Super. Ct. No. 16FE023574) |
| v. | |
| RONALD NORTHRUP, | |
| Defendant and Appellant. | |

Defendant Ronald Northrup sexually abused four young girls.  The victims were his daughter, H., his fiancée's daughter, F., a former girlfriend's daughter, S., and a former wife's niece, A.  Defendant was convicted of six counts of committing a lewd or lascivious act on a child under the age of 14 years.  The jury also found true an allegation that defendant committed sex offenses against two or more victims.  The trial court sentenced defendant to serve an aggregate indeterminate prison term of 105 years to life plus a consecutive determinate term of eight years.

On appeal, defendant contends: (1) the evidence is insufficient to support his conviction in count three, in which it was alleged that he touched S.'s stomach in a lewd or lascivious manner; (2) the trial court prejudicially abused its discretion and violated defendant's federal constitutional rights by (A) allowing the prosecution to introduce evidence that his fiancée, C., put locks on her daughters' (F. & H.) bedroom doors, (B) admitting six specific items of evidence defendant claims to be "irrelevant and inadmissible hearsay," (C) allowing the prosecutor to play H.'s entire forensic interview for the jury, and (D) admitting portions of two jailhouse phone calls between defendant and C.; (3) the prosecutor engaged in prejudicial prosecutorial misconduct; (4) the cumulative prejudicial effect of the foregoing assertions of error requires reversal; and (5) Senate Bill No. 567 (2021-2022 Reg. Sess.) (Senate Bill 567) (Stats. 2021, ch. 731) applies retroactively to defendant's case and requires remand for a new sentencing hearing.

Defendant's conviction in count three is supported by substantial evidence. His claims of evidentiary error are either forfeited, lacking in merit, or manifestly harmless. His assertion of prosecutorial misconduct is also forfeited. With respect to each forfeited claim, defendant's alternative assertion of ineffective assistance of counsel also fails. Nor does the cumulative prejudice from any assumed errors require reversal. However, as the Attorney General concedes, defendant is entitled to the ameliorative benefits of Senate Bill 567. We shall therefore affirm defendant's convictions, vacate his sentence, and remand the matter to allow the trial court to resentence defendant based on current sentencing laws.

## FACTS

### *Sexual Abuse of A. (Count Six)*

Defendant married A.'s aunt in 1997. They separated about two years later.[1] During the time they were together, A. was between two and four years old. She lived with her parents and grandmother at her grandmother's house in Wilton. Defendant and A.'s aunt also lived there. After the separation, defendant moved out. However, because he remained friends with A.'s father, defendant routinely came over to the house so they could hang out and drink alcohol together.

One night when A. was about seven or eight years old, defendant was at the house drinking alcohol with her father. A. fell asleep on a couch in the living room and awoke to defendant sexually assaulting her. As A. described during her testimony at trial: "I just remember there was this couch under the swamp cooler in my grandma's living room, and I fell asleep there, and I just remember waking up in the middle of the night, and he had . . . his hands down my pants . . . ." A. then described defendant touching her vagina with his hands beneath her clothing. When A. realized what was happening, she pretended she was still asleep, but rolled off the couch and onto the floor to get away from defendant. A. spent the rest of the night on the floor. She did not tell anyone what happened until she was 15 years old.

### *Sexual Abuse of S. (Counts Three & Four)*

In 2003, around the same time he molested A., defendant started dating S.'s mother. S. was around four years old. She lived with her mother and grandparents, also in Wilton. Her grandparents owned the property and lived in the main house. S. and her mother lived in a "mother-in-law suite," which was essentially a studio apartment located

---

[1] Defendant and A.'s aunt also had two sons together. There being no allegations in the present case that these children were molested by defendant, we will omit them from our recitation of relevant facts.

above a detached garage. Sometime after defendant's relationship with S.'s mother began, he moved in with them. The relationship lasted about a year and a half. The relationship ended because of defendant's admitted alcoholism. As defendant acknowledged during his trial testimony, he was drinking "a six pack, sometimes a 12" on a nightly basis, and "an 18 pack and a fifth" of hard liquor on the weekends. S. was between the ages of five and six when defendant moved out.

During the time defendant lived with S. and her mother, he sexually assaulted the child on one occasion. S. testified that her mother and grandmother were outside talking when defendant asked her to come into the bedroom area of their suite. When she did so, defendant asked if she "wanted to be a good girl" and then asked her to take off her clothes. S. complied. As S. described during her testimony at trial, defendant then "put [her] onto the bed," positioned her "onto [her] back," and "started to undo his belt and his pants." S. explained during cross-examination that she started out on the bed "face down, [her] head was on the bed, and [she] [was] crying and had her eyes closed." Defendant then flipped her over onto her back. S. "was telling him no and to stop and to get away." Rather than stop, defendant "pinned [S.] down on the bed so [she] couldn't . . . move[ ]" and "then inserted his penis into [her] vagina and started rocking back and forth for what seemed about 30 minutes." When defendant finally ended his assault, S. ran into the dining room area and hid behind the table.

S.'s mother noticed a change in S.'s behavior towards defendant about six months before she broke off the relationship. As she put it, "[S.] was less inclined to be in his presence" and "did not want to be left alone with him."

S. did not tell anyone what happened until she was about 13 years old. By then, she and her mother had moved to Idaho. S. was acting out and struggling in school. She eventually disclosed the abuse to a counselor and then her mother. Sometime after S.'s disclosure, defendant called S.'s mother. The call itself was not unusual, as they occasionally spoke on the phone. This time, however, S.'s mother cut off defendant's

4

attempt at casual conversation with, "do you not think I know what you did?" Defendant "quickly said I'm sorry and hung up."

### Sexual Abuse of F. (Counts One & Two)

In 2004, defendant started dating F.'s mother, C. F. was about three years old at the time. Defendant and C. had another daughter together, H., who was born in 2005.[2] This portion of the factual summary involves sexual abuse inflicted upon F.

At some point, defendant and C. were engaged to marry.[3] In 2010 or 2011, defendant, C., and their children moved into a house in Elk Grove owned by C.'s parents. At that house, when F. was in the fifth or sixth grade, defendant began sexually assaulting her. As F. described during her trial testimony, she and H. liked to sleep on the floor in their parents' room. On multiple occasions, defendant got up in the middle of the night, climbed down to the floor, and touched F. sexually, sometimes taking her clothes off and putting his fingers inside her vagina. F. pretended to be asleep while this was happening. F. testified that she did not remember defendant touching her vagina with his penis or his mouth.

However, during a forensic interview conducted in 2013, when F. was in the seventh grade, she described waking up because something was touching her and then seeing defendant on the floor next to her, on his knees, pulling the waistband of her pajamas away from her body, and placing his penis inside the pajamas and against her vagina. She said this happened on more than five occasions. F. also described defendant touching her vagina with his hands during these incidents. She further described one occasion in which defendant touched her anus with his mouth.

---

[2] They also had a son, born about a year later. As with defendant's other sons, there are no allegations in this case that he was molested by defendant. We therefore also omit this child from our recitation of relevant facts.

[3] Defendant's first marriage was not legally dissolved until 2008.

The forensic interview was prompted by F. disclosing the abuse to a school counselor. The counselor was concerned that F. was being bullied at school and called F. into her office to ask about that. F. said she was fine and was about to leave the office when she stopped and said she wanted to report "sexual harassment." She then told the counselor that defendant was touching her "private areas" at night, under her pajamas with his hands and his penis, while she slept on the floor in his and her mother's bedroom.

The counselor reported F.'s disclosure to the police. An officer arrived at the school and took F.'s statement. This statement was consistent with F.'s forensic interview and her disclosure to the counselor.

After F. disclosed the abuse, C. told defendant he would have to move out so that her children did not get taken away. Defendant did so. Sometime later, F. recanted her allegation of abuse. As she explained at trial, she felt that her entire family, including her mother and grandmother, "was very upset with [her]" over the allegation. When her grandmother told her "everything would go back to normal" if she recanted, F. decided to do so. After F. recanted, defendant moved back into the house. C. did, however, put a lock on F.'s bedroom door, to which only she and F. had a key. This did not make F. feel safe to be in the same house with defendant. C. later bought a second lock, for H.'s bedroom door.

In 2015 or 2016, defendant and C. bought a house together and moved the family to the new address, also in Elk Grove. C. also placed locks on the girls' bedroom doors at the new house.

Towards the end of 2016, police officers and social workers from child protective services took F. out of school and told her she was being placed in foster care. This made her feel frustrated and angry. As she explained: "I didn't feel helped at all. This situation felt worse." When the officers and social workers asked her again about defendant's abuse, she again said he had not abused her because, as she explained, "they

6

told me I was never going back home, and I definitely did want to go back home." F. was also angry about the way she felt the police and social workers were treating her, saying "they were very rude to me."

In April 2017, F. was living with a friend from school and her friend's mother. F. asked her friend's mother to contact a social worker or police officer so that she could tell them the truth about defendant's conduct. A detective then came over to the house. F. told the detective that her original statement from 2013 was the truth and that defendant had in fact sexually abused her.

### *Sexual Abuse of H. (Count Five)*

We finally recount the sexual abuse inflicted by defendant upon his daughter, H. Sometime before the family moved into the new house, H. was sleeping on a couch in the living room on a weekend morning before her soccer game. Defendant came into the room and got on the couch with her. As he did so, he positioned himself on top of her and placed his penis between her thighs. H. was scared when she woke up to this. Defendant then slid himself over to the side of her on the couch as H. said "good morning" and then quickly got up and left the room.

Not long after this occurred, H. told F. what had happened and asked her to tell their mother. F. did so. C. told H. that she could no longer sleep in the living room and also bought a lock for H.'s bedroom door. H. went to the hardware store with her mother to buy the lock. At the store, H. overheard her mother talking to defendant on the phone. C. told defendant: "I know what you did." C. later suggested that H. should not tell anyone else what happened, saying: "[H.], do you want your dad to go to court?"

7

Finally, we note that H.'s forensic interview, conducted in January 2017, was consistent with her trial testimony.[4]

Additional relevant evidence will be recounted during the discussion portion of this opinion, to which we now turn.

DISCUSSION

**I**

*Sufficiency of the Evidence*

Defendant contends the evidence is insufficient to support his conviction in count three. We disagree.

" 'In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]' [Citations.] All conflicts in the evidence and questions of credibility are resolved in favor of the verdict, drawing every reasonable inference the jury could draw from the evidence. [Citation.] Reversal on this ground is unwarranted unless ' "upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." ' [Citation.] This standard applies whether direct or circumstantial evidence is involved. [Citation.]" (*People v. Cardenas* (2015) 239 Cal.App.4th 220, 226-227.)

Penal Code "section 288 is violated by 'any touching' of an underage child committed with the intent to sexually arouse either the defendant or the child." (*People v. Martinez* (1995) 11 Cal.4th 434, 442.) This section "prohibits *all* forms of sexually motivated contact with an underage child. Indeed, the 'gist' of the offense has always

_____

**4** During this interview, H. said defendant put his "balls" between her legs on the couch. She testified that, at the time she was interviewed, she "thought [the words penis and balls] meant the same thing."

8

been the defendant's intent to sexually exploit a child, not the nature of the offending act. [Citation.] '[T]he purpose of the perpetrator in touching the child is the controlling factor and each case is to be examined in the light of the intent with which the act was done. . . . If [the] intent of the act, *although it may have the outward appearance of innocence,* is to arouse . . . the lust, the passion or the sexual desire of the perpetrator [or the child,] it stands condemned by the statute . . . .' [Citation.]" (*Id*. at p. 444.)

Here, defendant was convicted of two counts of lewd or lascivious conduct based on the following acts. Defendant asked S. whether she wanted to be a good girl, had her take her clothes off, and then put her on the bed. S. was initially face down on the bed, crying with her eyes closed. Defendant then flipped her over onto her back as she told him to stop and to get away. Rather than stop, defendant held S. down on the bed and forcibly raped the child. Count four was based on defendant touching S.'s vagina with his penis. Count three was based on defendant touching S.'s stomach with his hand. While S. did not specifically testify that defendant touched her stomach with his hand during this incident, reasonable jurors could have inferred that defendant did so when he flipped the child over on the bed. There can be no doubt that defendant intended to sexually exploit S. when he flipped her over in order to rape her. That is the gravamen of the offense, not the nature of the touching itself.

The evidence is sufficient to support defendant's conviction in count three.

## II

### *Evidentiary Error*

We now turn to defendant's claims of evidentiary error. Specifically, he argues the trial court prejudicially abused its discretion and violated his federal constitutional rights by (A) allowing the prosecution to introduce evidence that C. put locks on her daughters' bedroom doors, (B) admitting six specific items of evidence defendant claims to be "irrelevant and inadmissible hearsay," (C) allowing the prosecutor to play H.'s entire forensic interview for the jury, and (D) admitting portions of two jailhouse phone

9

calls between defendant and C.  We address each in turn and conclude reversal is not required.

## A.

### *Admission of Evidence of the Door Locks*

Defendant challenges all evidence establishing that C. placed locks on her daughters' bedroom doors, including F.'s testimony, H.'s testimony, H.'s forensic interview, and testimony from one of the detectives working the case.  The challenge is based on relevance.  Defendant argues: "[C.'s] belief in [defendant's] guilt, demonstrated by her installing locks on the girls' bedroom doors, is not relevant to any issue in the case."  However, as defendant acknowledges, he "did not object on relevance grounds to the testimony regarding the locks."  He has therefore forfeited this claim on appeal. (*People v. Cole* (2004) 33 Cal.4th 1158, 1198-1199; *People v. Alvarez* (1996) 14 Cal.4th 155, 204, fn. 14.)

Nor are we persuaded defendant's trial counsel provided constitutionally deficient assistance by failing to so object.  "To secure reversal of a conviction for ineffective assistance of counsel, a defendant must establish that counsel's performance fell below an objective standard of reasonableness and that, to a reasonable probability, defendant would have obtained a more favorable result absent counsel's shortcomings.  [Citation.] If the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal.  [Citation.]" (*People v. Kraft* (2000) 23 Cal.4th 978, 1068-1069.)

Here, the record does not reveal why counsel refrained from objecting to the door lock evidence.  Defendant argues, however, that there could be no satisfactory reason for failing to object because the evidence was inadmissible and "counsel objected to the majority of the inadmissable [*sic*] evidence of [C.'s] statements and conduct." Setting aside whether the evidence was irrelevant, as defendant argues, or rather, as the Attorney

General argues, relevant to place in context F.'s recantation and H.'s failure to press C. to report defendant's abuse to the police, we conclude there is no reasonable probability of a more favorable outcome had defense counsel successfully objected to the evidence.

F., H., S., and A. each provided damaging testimony about the abuse inflicted upon them by defendant. The testimony of F. and H. was corroborated by their prior statements during their separate forensic interviews. While F. testified that she did not remember certain aspects of defendant's abuse, her forensic interview more thoroughly detailed that abuse. F. also told a school counselor and a police officer about the abuse, which precipitated the forensic interview. And while F. recanted the abuse for a period of time, she had a logical explanation for that recantation, i.e., she was being treated poorly at home and was told that things would return to normal if she recanted. The prosecution also called an expert in Child Sexual Abuse Accommodation Syndrome (CSAAS), who testified that it is not uncommon for children who suffer sexual abuse to recant because of "family pressure" and a desire for the "the negative consequences of telling" to go away.[5]

There was also evidence of defendant's consciousness of guilt. As previously described, after S. disclosed the abuse to a school counselor several years later,[6] defendant and S.'s mother spoke on the phone. During the call, S.'s mother indicated that she knew what defendant had done. Defendant said he was sorry and ended the conversation. Also damaging was the fact that the victims were all around the same age when defendant sexually abused them, and the abuse followed a similar pattern with

---

[5] This testimony was not offered to prove F., or any of the victims, was in fact sexually abused. Rather, it was offered to dispel common misconceptions the jurors might have had about the behavior of an abused child, such as an erroneous belief that a child who has been sexually abused would not recant her allegation.

[6] The CSAAS expert also testified that child victims of sexual abuse often delay disclosing the abuse.

11

respect to each victim. Defendant committed the crimes against three of the four victims while they were asleep. Defendant's admitted alcoholism appears to have played a role in at least half of the counts. And the victims were similarly situated in defendant's predatory orbit, i.e., his own daughter (H.), the daughters of a girlfriend (S.) and fiancée (F.), and a former wife's niece (A.).

Finally, while defendant testified in his own defense and denied abusing the children, the jury was not required to believe him. Moreover, defendant did not deny the incident with his daughter occurred, but instead claimed it was "an accident." Again, the jury was not required to believe there was an innocent explanation for defendant's penis touching H. between her legs. And while defendant also testified that he believed F. fabricated her allegations of abuse because she was upset when she learned that defendant was not her biological father, defendant had no explanation for why the other victims would have made up their allegations.

In light of the strength of the case against defendant, we must reject defendant's assertion of ineffective assistance of counsel for lack of prejudice.

## B.

### *Hearsay Claims*

We now turn to defendant's hearsay claims. "Hearsay is an out-of-court statement that is offered for the truth of the matter asserted, and is generally inadmissible." (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1108, citing Evid. Code, § 1200.)[7] We review for abuse of discretion a trial court's ruling as to whether or not evidence is hearsay, and if hearsay, nevertheless admissible under one of the many exceptions to the hearsay rule. (See *People v. DeHoyos* (2013) 57 Cal.4th 79, 132.) Most of defendant's claims can be rejected not because the challenged statements fall within an exception to the hearsay

---

**7**    Undesignated statutory references are to the Evidence Code.

rule, but because they were not admitted for the truth of the matter asserted, and therefore were not hearsay at all.

For example, defendant's first hearsay claim challenges H.'s testimony that after she told F. about defendant's conduct on the couch, and asked F. to tell their mother, C. told H. that she could no longer sleep in the living room. Defense counsel objected to this testimony on hearsay grounds. The trial court overruled the objection. Defendant argues the statement should have been excluded because it was "offered to establish the truth of the matter asserted: that [C.] did not want [H.] to sleep in the living room, obviously implying that [C.] believed [H.] would again be molested by [defendant] if she was not protected from him." Not so.

C.'s out-of-court statement to H., essentially, "stop sleeping in the living room," was directive in nature and "was neither inherently true nor false." (*People v. Curl* (2009) 46 Cal.4th 339, 362; see also *People v. Clark* (2016) 63 Cal.4th 522, 595 [commands are not hearsay].) To be sure, the jury may well have inferred from C.'s command that C. believed H. was telling the truth about defendant's conduct. But the hearsay rule does not prevent the admission of verbal conduct that suggests the declarant believes something to be true. (See *People v. Dalton* (2019) 7 Cal.5th 166, 232 [statement that does not declare a mental state, but is rather circumstantial evidence of the declarant's state of mind, is not hearsay].) Instead, the hearsay rule prevents the admission of an out-of-court statement to prove the truth of the matter asserted *in the statement*. "Stop sleeping in the living room" does not assert anything to be true; it simply directed H. to stop sleeping in the living room.

The same analysis applies to defendant's second hearsay claim. Defendant argues the trial court should have precluded the prosecutor from asking H. whether her mother told her to use a "code word or phrase" if "something happened to [her] again." After the trial court overruled defense counsel's hearsay objection, H. testified that she did not remember. The prosecutor then had H. review a statement she gave to a detective after

she disclosed the abuse, presumably indicating that C. had given her daughter a code word or phrase to use in case of further abuse. H. again said she did not remember. However, in H.'s forensic interview, which was played for the jury in its entirety, H. stated that her mother told her that if defendant abused her again, H. was supposed to tell her that she wanted to go to the store. Thus, the out-of-court statement is essentially, "If defendant touches you inappropriately, tell me you want to go to the store." As with the command to no longer sleep in the living room, this direction to use a code phrase in case of further sexual abuse does not assert anything to be true or false and therefore could not have been admitted to prove the truth of the matter asserted. (See *People v. Clark*, *supra*, 63 Cal.4th at p. 595; *People v. Curl*, *supra*, 46 Cal.4th at p. 362.) While it certainly suggests that C. believed H.'s allegation of abuse, that does not make the statement hearsay. (See *People v. Dalton*, *supra*, 7 Cal.5th at p. 232.)

To the extent defendant argues either of the foregoing commands was relevant only to prove C. believed H., and as he argued with respect to the door lock evidence, "[C.'s] belief in [defendant's] guilt . . . is not relevant to any issue in the case," defense counsel did not object to either statement on relevance grounds. Any such claim on appeal is therefore forfeited. (*People v. Cole*, *supra*, 33 Cal.4th at pp. 1198-1199; *People v. Alvarez*, *supra*, 14 Cal.4th at p. 204, fn. 14.) It would also be harmless based on the strength of the case against defendant.

Defendant's third hearsay claim fails for a different reason. In this claim, defendant argues the trial court abused its discretion by allowing H. to testify that when she and her mother were at the hardware store buying the door lock for her bedroom, C. spoke to defendant on the phone and told him: "I know what you did." The trial court overruled defense counsel's hearsay objection and admonished the jury that the statement was not being admitted for the truth of the matter asserted, but rather for the effect of the statement on both defendant and H. Unlike the commands in defendant's first two hearsay claims, the statement "I know what you did" does state something that can be

true or false. However, as the trial court explained, it was not being admitted to prove that C. did in fact know what defendant did to H. It was instead admitted for the effect the statement had on both defendant and H. The statement was therefore not hearsay because " 'it is the hearer's reaction to the statement that is the relevant fact sought to be proved, not the truth of the matter asserted in the statement.' [Citation.]" (*People v. Scalzi* (1981) 126 Cal.App.3d 901, 907.)

Of course, the hearer's reaction must itself be a relevant issue in the case. Defendant argues no one witnessed his reaction to the statement, "so the jury could not possibly gauge the effect, if any, it had on him." Assuming, without deciding, that defendant is correct in this regard, we conclude it was relevant to the jury's assessment of H.'s subsequent behavior. As the Attorney General argues, the fact that H. heard her mother confront defendant on the phone might have "explained why [defendant's] molestation of her did not come to light until the police contacted *her* in 2016." In other words, H. might have believed her mother had the situation under control and there was no need to tell anyone else, including the police, about the abuse. There was no abuse of discretion.

Fourth, defendant argues the trial court abused its discretion by allowing H. to testify that her mother asked her whether she wanted her father to have to go to court. Implicit in this question is the statement that defendant would have to go to court if H. told anyone else what he did to her. But this was not admitted to prove the truth of that statement. Instead, it too was properly admitted for its effect on the hearer, H. The statement suggested that H. should not tell anyone else what defendant did to her. The jury was entitled to consider this in connection with H.'s failure to disclose the abuse to anyone else until the police asked her about it.

Defendant's final two hearsay claims involve out-of-court statements made by F. to the detective who interviewed her in 2017 when she took back her recantation and again claimed the abuse occurred. During F.'s testimony, she stated that she could not

remember whether or not her mother told her to "fix it" in 2013, meaning recant her allegation of abuse. The prosecutor later called the detective, who testified that F. told her that C. did tell her to "fix it." This testimony was admitted over a hearsay objection. The prosecutor argued it qualified as both a prior consistent statement and a prior inconsistent statement. The trial court admitted the statement as a prior consistent statement. Defendant argues neither exception to the hearsay rule applies. The detective then testified that F. also told her that C. was currently, at the time of the 2017 interview, "sending her communication via an email again telling her to recant." This testimony was admitted over a hearsay objection as circumstantial evidence of F.'s state of mind. The jury was so instructed. Defendant argues the foundational requirements for application of the state of mind exception to the hearsay rule were not met.

In response to both hearsay claims, the Attorney General argues forfeiture, and in any event, "[F.'s] statements to [the detective] about her mother pressuring her to recant in 2013 and 2017 were admissible as a past recollection recorded," citing section 1237. Defendant argues in reply that the claims are not forfeited and the foundational requirements of section 1237 have not been met.

These claims are not forfeited. Defense counsel objected on hearsay grounds to both challenged statements. "The primary purpose in requiring an objection in the trial court—to apprise the court of asserted error to permit its correction at that time—was clearly accomplished here. No more was required." (*People v. Robinson* (1966) 239 Cal.App.2d 579, 588.)

We are also unimpressed with the Attorney General's argument regarding the past recollection recorded exception to the hearsay rule. The entirety of the Attorney General's argument in this regard is the following: "[F.] testified that she could not recall whether her mom had told her to recant and she told the truth to [the detective]. The matters [F.] described were fresher in her mind when she talked to [the detective] than three years later when [defendant's] trial took place." Rule 8.204 of the California Rules

16

of Court requires "[e]ach brief" to "support each point by argument and, if possible, by citation of authority . . . ." (Cal. Rules of Court, rule 8.204(a)(1).) If defendant, as the appellant in this appeal, had made the conclusory argument advanced by the Attorney General, without even providing the text of section 1237, let alone showing in any meaningful manner how the requirements of this hearsay exception have been satisfied, we would consider the argument forfeited. (See, e.g., *WFG National Title Ins. Co. v. Wells Fargo Bank, N.A.* (2020) 51 Cal.App.5th 881, 894-895.) The rule precluding conclusory arguments of this sort does not, however, apply only to an appellant's opening brief. It applies to each brief, including the respondent's brief. We therefore decline to consider this new basis for upholding the trial court's evidentiary ruling.

Nor must we determine whether an abuse of discretion occurred in admitting the two challenged statements. This is because any such abuse was manifestly harmless. Preliminarily, the "fix it" statement presents two layers of potential hearsay. At the first layer, C. told F. to "fix it" in 2013; at the second layer, F. told the detective in 2017 that this statement was made by C. four years earlier. The first layer is directive and not a truth statement. C. directed F. to recant. This is not hearsay. (See *People v. Clark*, *supra*, 63 Cal.4th at p. 595.) The second layer, F. telling the detective that C. directed her to recant, does appear to have been offered to prove the truth of the matter asserted in the statement, i.e., that C. directed F. to recant. F. further told the detective that C. was e-mailing her "again telling her to recant." Again, C.'s e-mail directive is not hearsay; F.'s out-of-court statement saying she received that directive does appear to have been admitted to prove the truth of the matter asserted, notwithstanding the trial court's admonishment to the jury that it was being admitted as circumstantial evidence of F.'s state of mind. Indeed, neither out-of-court statement (essentially, "C. told me to 'fix it' in 2013" and "C. again told me to recant via e-mail in 2017") is relevant to F.'s state of mind unless the statement is true.

However, assuming without deciding that defendant is correct that no exception to the hearsay rule applies, admission of this evidence was harmless. F. testified that after she disclosed the abuse, her entire family, including her mother and grandmother, was very upset with her. She decided to recant after her grandmother told her that everything would go back to normal if she recanted. Thus, the jury already had sufficient grounds to conclude F. recanted because of family pressure. That C. specifically told F. to recant in 2013 and 2017 was therefore cumulative. The jury also properly heard that C. suggested to H. that she should not tell anyone else what defendant did to her. The evidence against defendant was also very strong, as we have explained in some detail above. We conclude there is no reasonable probability that the outcome would have been any different had these two recantation statements been excluded.

## C.

### *Admission of H.'s Forensic Interview*

Defendant also contends the trial court prejudicially abused its discretion by allowing the prosecutor to play H.'s entire forensic interview, rather than only the portions of the interview describing the sexual abuse. We conclude this contention is forfeited.

Section 1360 provides in relevant part:

"(a) In a criminal prosecution where the victim is a minor, a statement made by the victim when under the age of 12 describing any act of child abuse or neglect performed with or on the child by another, or describing any attempted act of child abuse or neglect with or on the child by another, is not made inadmissible by the hearsay rule if all of the following apply:

"(1) The statement is not otherwise admissible by statute or court rule.

"(2) The court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide sufficient indicia of reliability.

18

"(3) The child either:

"(A) Testifies at the proceedings.

"(B) Is unavailable as a witness, in which case the statement may be admitted only if there is evidence of the child abuse or neglect that corroborates the statement made by the child." (§ 1360, subd. (a).)

On appeal, defendant takes issue with portions of H.'s forensic interview describing C.'s conduct and statements, H.'s feelings about living apart from her mother and not being able to see her sister, and H.'s interests and activities, arguing these portions of the interview should have been excluded because they do not amount to "descriptions of child abuse." However, while defense counsel asked the trial court to review the interview prior to its admission, outside the presence of the jury, in order to ensure "that the time, content, and circumstances of the statement provide sufficient indicia of reliability" (§ 1360, subd. (a)(2)), counsel did not ask the trial court to exclude specific portions of the interview as outside the scope of section 1360.

"[O]ur high court has consistently held that a ' " 'defendant's failure to make a timely and *specific* objection' on the ground asserted on appeal makes that ground not cognizable. [Citation.]" ' [Citation.] ' "The reason for the requirement is manifest: a specifically grounded objection to a defined body of evidence serves to prevent error. It allows the trial judge to consider excluding the evidence or limiting its admission to avoid possible prejudice. It also allows the proponent of the evidence to lay additional foundation, modify the offer of proof, or take other steps designed to minimize the prospect of reversal." ' [Citation.] ' "[T]he objection must be made in such a way as to alert the trial court to the . . . basis on which exclusion is sought, and to afford the People an opportunity to establish its admissibility." [Citation.] What is important is that the objection fairly inform the trial court, as well as the party offering the evidence, of *the specific reason or reasons* the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a

19

fully informed ruling. If the court overrules the objection, the objecting party may argue on appeal that the evidence should have been excluded for the reason asserted at trial, but it may not argue on appeal that the court should have excluded the evidence for a reason different from the one stated at trial. *A party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct*.' [Citation.]" (*People v. Holford* (2012) 203 Cal.App.4th 155, 168-169 (*Holford*).)

In *Holford*, a child pornography case, the defendant sought to exclude, under section 352, the entire 25-minute video forming the basis of the child pornography count, offering to stipulate that the video " 'is, in fact, child pornography.' " (*Holford*, *supra*, 203 Cal.App.4th at p. 168.) After indicating that the prosecution would be allowed to play at least a portion of the video, and discussing with the parties the possibility of them coming to an agreement with respect to playing "an abridged version," no agreement was reached, and the trial court ultimately ruled the entire video could be played. (*Id*. at pp. 162-164.) After the ruling was made, defense counsel argued a seven-minute excerpt should instead be played, but did not identify a specific excerpt or ask the trial court to "review the video with an eye toward editing it." (*Id*. at p. 165.) The trial court confirmed its ruling. On appeal, the defendant asserted the trial court abused its discretion because there were less prejudicial means of conveying the same information. (*Id*. at p. 168.) We held the claim was forfeited. As we explained, while the defendant objected on section 352 grounds below, and renewed that general objection on appeal, because the specific evidentiary alternatives asserted to be less prejudicial on appeal were not identified for the trial court below, that court was not "fully apprised of the basis on which exclusion [was] sought." (*Holford,* at p. 170.)

Here, while defense counsel raised section 1360 below, the trial court was specifically asked to review the forensic video for "sufficient indicia of reliability" (§ 1360, subd. (a)(2)). The trial court was not asked to review the video with an eye towards editing it to remove portions of the interview that did not contain descriptions of

20

abuse. The contention that the trial court abused its discretion by failing to exclude those portions is therefore forfeited. (*Holford*, *supra*, 203 Cal.App.4th at p. 169.)

Anticipating forfeiture, defendant argues his trial counsel provided constitutionally deficient assistance by failing to make the requisite specific objections. We are not persuaded. As stated previously, a claim of ineffective assistance of counsel requires a showing of (1) deficient performance and (2) resulting prejudice. (See *People v. Kraft*, *supra*, 23 Cal.4th at pp. 1068-1069.) Setting aside the element of deficient performance, we conclude defendant has not demonstrated prejudice. First, defendant does not claim the portion of H.'s forensic interview that described the abuse was inadmissible. That was the damaging portion of the interview. Second, the interview itself was largely duplicative of H.'s trial testimony. Third, we have already concluded C.'s conduct and statements were not prejudicial. Fourth, there was nothing inherently prejudicial about H.'s feelings about her mother and sister or her interests and activities. And finally, as already explained in some detail, the case against defendant was very strong. We conclude there is no reasonable probability of a more favorable outcome had defense counsel successfully limited H.'s forensic interview to her statements describing defendant's sexual abuse.

## D.

### *Admission of the Jailhouse Phone Calls*

Defendant's final evidentiary claims involve two phone calls between defendant and C. while defendant was in jail. In the first call, defendant said: "[F.] is throwing your mom underneath the bus and she might be looking at extra charges right now. Honestly, to tell you the truth. Um, it's what's going on through the court so I just wanted to let you know. So, for right now um, from what [F.] and [H.] have to say in court, it is what it is. But, [F.], threw your mom underneath the bus and it's not looking good for your mom. So, i[f] they were gonna do that to begin with, it would have been

21

nice if you would have said something through the grapevine."**8** In the second call, defendant again said that F. was "throwing [C.'s] mom underneath the bus." He continued: "About hella shit, and the DA is almost questioning about pressing charges against your mom. So, I mean, I'm just letting you know what's going on with my part. About the 2013 shit, I mean I'm only looking out for you guys, you guys are family, so. I mean, you sent hella shit my way. I appreciate you. I understand where you're coming from. But the girls, man, they're all against me, so. But it is what it is." Defendant then told C. that he loved her and the children and concluded by repeating: "Uh, but honestly uh [F.] is throwing, not you, at all, she is going completely around you, but she's throwing your mom underneath the bus."

The foregoing portions of the calls were admitted over relevance and section 352 objections as bearing on F.'s credibility and "[n]ot particularly prejudicial." Other portions of the calls were ordered redacted as unduly prejudicial.

Defendant renews his argument that the calls were irrelevant and prejudicial. We are not persuaded. A reasonable jury could have construed defendant's statements to C. as suggesting that she do something about F.'s testimony that her grandmother pressured her to recant in 2013. What exactly C. was supposed to do about it was unclear, but the very fact that defendant repeatedly informed C. that F. was "throwing [C.'s] mom underneath the bus" generally corroborates F.'s testimony that the family, including her mother and grandmother, had essentially taken defendant's side and this caused her to recant the allegation of abuse. Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact," including "the credibility of a witness." (§ 210.) The admitted portions of these phone calls easily clear this relevance hurdle.

---

**8**    Defendant testified that "through the grapevine" meant through his attorney.

Nor are we persuaded the trial court should have nevertheless excluded the evidence under section 352. This section provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (§ 352.) We agree with the trial court's assessment that the admitted portions of the phone calls were "[n]ot particularly prejudicial."

There was no abuse of discretion.

## III

### *Prosecutorial Misconduct*

Defendant further asserts the prosecutor engaged in prejudicial prosecutorial misconduct by (1) suggesting during her cross-examination of defendant that the locks C. placed on her daughters' bedroom doors in order to protect them from defendant would have prevented them from escaping had there been a fire, and (2) arguing a fact not in evidence during her closing argument, specifically that F. told the detective who interviewed her in 2017 that she and her grandmother "practice[d]" F.'s recantation and also her "story about [defendant] not being [her] biological father." These claims are forfeited for defense counsel's failure to object to the asserted misconduct and request a curative admonition. (*People v. Friend* (2009) 47 Cal.4th 1, 29.)

Nor does defendant's alternative assertion of ineffective assistance of counsel require reversal. As with each such claim discussed previously, there is no reasonable probability of a more favorable outcome had defense counsel successfully objected and received an appropriate admonition. We have previously described the very strong case against defendant. These prosecutorial remarks, assuming they amounted to error, do not undermine our confidence in the outcome.

23

# IV

## *Cumulative Prejudice*

Having concluded a number of defendant's contentions are forfeited, we went on to reject his alternative assertion of ineffective assistance of counsel by concluding that any assumed error was not prejudicial. We also assumed, without deciding, that two of defendant's hearsay claims had merit, but were harmless. We now conclude that a cumulative assessment of these assumed errors does not require reversal either. Defendant's argument to the contrary therefore also fails. (See *People v. Beck and Cruz* (2019) 8 Cal.5th 548, 672 [several actual and assumed errors "not prejudicial when considered cumulatively"].)

# V

## *Senate Bill 567*

Finally, the parties agree that Senate Bill 567 applies retroactively to defendant's case and requires remand for a new sentencing hearing.

Senate Bill 567 became effective January 1, 2022. (Cal. Const., art. IV, § 8, subd. (c).) The enactment amended Penal Code section 1170 to limit the trial court's ability to impose an aggravated term of imprisonment absent the existence of specified circumstances. (Pen. Code, § 1170, subd. (b)(1)-(3).) As amended, Penal Code section 1170 makes the middle term of the determinate sentencing triad the presumptive prison term unless specified circumstances exist. (Pen. Code, § 1170, subd. (b)(1)-(2).) A trial court "may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (Pen. Code, § 1170, subd. (b)(2).)

24

Because the trial court imposed an upper term sentence for count four and the judgment is not yet final, Senate Bill 567 applies retroactively to defendant's case. (See *In re Estrada* (1965) 63 Cal.2d 740, 744-745 [absent evidence of contrary legislative intent, ameliorative criminal statutes apply to all cases not final when the statute takes effect]; see also *People v. Woods* (2018) 19 Cal.App.5th 1080, 1090-1091.) In light of the trial court's reliance on factors in aggravation that were neither admitted by defendant nor found true beyond a reasonable doubt, we must vacate the sentence and remand the matter for resentencing.

In view of the rapidly evolving laws governing sentencing discretion, we remand the matter for full resentencing, where defendant may raise any arguments available to him under current law. (See *People v. Ramirez* (2019) 35 Cal.App.5th 55, 64 [when a case is remanded for resentencing, the trial court may consider the entire sentencing scheme and has jurisdiction to modify any aspect of the sentence].) We express no opinion as to how the trial court should exercise its discretion on remand.

## DISPOSITION

Defendant's convictions are affirmed, the sentence is vacated, and the matter is remanded for a full resentencing. In all other respects, the judgment is affirmed.


/s/
HOCH, J.


We concur:


/s/
MAURO, Acting P. J.


/s/
DUARTE, J.

25